*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0249p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA, ex rel. SNAPP, INC.,
                      *Plaintiff-Appellant,*

    *v.*

FORD MOTOR COMPANY,

                      *Defendant-Appellee.*

No. 07-1474

>

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 06-11848—Avern Cohn, District Judge.

Argued: April 24, 2008

Decided and Filed: July 9, 2008

Before: SUHRHEINRICH, CLAY, and COOK, Circuit Judges.

---

## COUNSEL

**ARGUED:** Jeffrey Dale Stamper, Louisville, Kentucky, for Appellant. Francis R. Ortiz, DICKINSON WRIGHT PLLC, Detroit, Michigan, for Appellee. **ON BRIEF:** E. Powell Miller, David Fink, THE MILLER LAW FIRM, Rochester, Michigan, for Appellant. Francis R. Ortiz, Kenneth J. McIntyre, DICKINSON WRIGHT PLLC, Detroit, Michigan, for Appellee.

    CLAY, J., delivered the opinion of the court. SUHRHEINRICH, J. (p. 13), delivered a separate concurring opinion. COOK, J. (p. 14), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

    CLAY, Circuit Judge. Relator SNAPP, Inc. brings this *qui tam* action under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, claiming that Defendant Ford Motor Company ("Ford") fraudulently induced the federal government to contract with Ford by inflating, in official reports to the government, the extent of Ford's dealings with small and minority-owned businesses. The district court dismissed Relator's complaint for failure to comply with Fed. R. Civ. P. 9(b)'s requirement that a party alleging fraud "state with particularity the circumstances constituting fraud . . . ." Because Relator failed to plead with such particularity the nature of Ford's claim for payment from the federal government, we **AFFIRM** the district court's decision dismissing Relator's First

1

Amended Complaint.  However, because the district court did not have the benefit of our decision in *United States ex rel Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 502 (6th Cir. 2007) ("*Bledsoe II*") before denying Relator's motion to file an amended complaint, we **VACATE** the district court's order denying the motion to file an amended complaint and **REMAND** the matter for consideration in light of *Bledsoe II*.

## STATEMENT OF FACTS

**A.     Factual Allegations**

Because Relator is appealing a district court order dismissing its complaint under Rule 12(b)(6), this Court must accept as true all of the factual allegations contained the complaint.[1] *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360 (6th Cir. 2001).  According to Relator, Ford is a "prime contractor" to the United States,[2] and is accordingly required to comply with certain federal laws governing the use of small and minority-owned businesses as subcontractors.  Among these requirements, a prime contractor may not contract with the federal government unless they establish a plan to "provide[] the maximum practicable opportunity" for small businesses and minority-owned businesses to subcontract with the prime contractor.[3]  15 U.S.C. § 637(d)(4)(D). Failure to develop such a plan can render a prime contractor ineligible to receive federal contracts. *See id.*

Relator alleges that, from 1991 until 1999, Ford fraudulently exaggerated the extent of its dealings with small and minority-owned businesses, and that these exaggerations induced the federal government to contract with Ford, even though Ford never implemented a plan to "provide[] the maximum practicable opportunity" to such businesses.  According to Relator, during this eight-year period Relator was controlled entirely by Ford.  Ford nominated the majority of Relator's board members, its organization charts included Relator and its employees, and Ford had full control over its dealings with Relator.  Though Relator was nominally owned and managed by a person of color, Relator maintains that this nominal control was a sham, and that Relator actually operated as a subdivision of the Ford Motor Company.  Moreover, Relator claims, even if it did qualify as a minority-owned business during its dealings with Ford, from 1995 until 1999, Relator had too many employees to qualify as a small business.

Despite Relator's claims that it functioned entirely as a subdivision of Ford, Ford filed official reports with the government stating that, between 1991 and 1998, Ford made significant improvements in the amount of business it subcontracted to small and minority-owned businesses. As a prime government contractor, Ford was required to file yearly reports documenting what percentage of the subcontracts related to its government contracts were made with small or minority-owned businesses.  According to these reports, Ford increased its subcontracting with small businesses from 19.2% in 1991 to 22.9% in 1998, reaching a peak of 24% in 1993.  Over the same period, Ford also increased its subcontracting with small minority-owned businesses from 2.6% of

---

[1]Unless otherwise specified, the word "complaint" will refer to Relator's First Amended Complaint, which is the subject of most of Relator's claims on appeal.

[2]The term "prime contractor" refers to a general contractor who is eligible to contract directly with the federal government. *See United States ex rel. Sanders v. Allison Engine Co., Inc.*, 471 F.3d 610, 612 (6th Cir. 2006); *vacated on other grounds by Allison Engine Co., Inc. v. United States ex rel. Sanders*, — S.Ct. —, 2008 WL 2329722 (June 9, 2008).

[3]Specifically, federal law requires prime contractors to establish a plan to provide opportunities to "socially and economically disadvantaged small business concern[s]," which is defined as a small business in which racial, ethnic and cultural minorities who have historically experienced discrimination hold at least a 51% ownership share of the business.  15 U.S.C. § 637(a)(4) & (5).

the total amount of its government-related subcontracts to 4.8%. In its 1999 report, Ford stated that 23.3% of its government-related subcontracts were made with small businesses. Although this report also shows a sharp decline in the amount of subcontracts made with small minority-owned businesses, the report also indicates that Ford intended to purchase $3.3 billion worth of supplies from minority-owned businesses, a statement which, if true, would have reflected to an increase in Ford's dealings with such businesses between 1998 and 1999.

The crux of Relator's complaint is that, despite Ford's reports claiming that it had enacted and was successfully implementing a plan to "provide[] the maximum practicable opportunity" to small and minority-owned businesses, Ford had inflated the extent of its dealings with such businesses by fraudulently declaring money paid to Relator as a subcontract with a small and minority-owned business. According to Relator, "the Relator was being used by Ford as a conduit for the satisfaction of Ford's, not the Relator's, obligations to Ford's majority suppliers of goods and services to Ford." (J.A. 245) Ford, Relator claims, would subcontract with a large, majority-owned business; Ford would then launder its payments to that large, majority-owned business through Relator. Under this scheme, Relator would receive those payments only for the purpose of passing them through to the large, majority-owned subcontractor, but Ford would still report these transactions to the government as a subcontract with a small, minority-owned business.

Relator further alleges that Ford knowingly or recklessly submitted reports that exaggerated its dealings with small and minority-owned businesses, and that these exaggerations were substantial. In 1998, for example, Ford reported that it paid $2.46 billion to small, minority-owned subcontractors. According to Relator, however, $461 million of this $2.46 billion were sham payments laundered through Relator. Similarly, in 1999 Ford predicted in its reports to the government that it would pay $3.3 billion to small, minority-owned subcontractors, but Relator claims that $556 million of this $3.3 billion were sham payments.

In light of these alleged sham payments, Relator claims that had the federal government been aware that Ford was exaggerating its dealings with small and minority-owned businesses, it would not have permitted Ford to act as a prime contractor. Accordingly, Relator argues, none of the federal government contracts Ford received during the period that it was allegedly inflating its dealings with small and minority-owned businesses would have been awarded to Ford. Because these contracts were allegedly awarded to Ford as a direct result of Ford's fraudulent statements, Relator further claims that none of the payments made to Ford under these contracts would have been made had Ford not deceived the government.

## B.  Procedural History

On April 30, 2003, Relator filed its original complaint, under seal, in the Southern District of Ohio. That complaint was unsealed on July 19, 2004, when the United States declined to intervene.[4] Nevertheless, process was not served on Ford until February 10, 2006, and only after the Southern District of Ohio issued two orders inquiring into the reason for this delay. Despite the delay, Ford stipulated to its acceptance of this service, and does not allege on appeal that this case should be dismissed on account of the delay. On April 14, 2006, the parties also stipulated to a transfer of this case to the Eastern District of Michigan.[5]

---

[4]A *qui tam* action is a False Claims Act claim brought by a relator, a private person alleging fraud by government contractors against the government. 31 U.S.C. § 3730. The relator must first serve the complaint upon the government, and the complaint then remains under seal for at least sixty days. § 3730(b)(2). During this time period, the government may elect to intervene. If the government does not intervene in the action, the relator may proceed with the action.§ 3730(b)(4)(B), (c)(3).

[5]Except as otherwise indicated, we use the term "district court," to refer to the Eastern District of Michigan.

On September 7, 2006, the district court issued an order dismissing a portion of Relator's claim and ordering Relator to file an amended complaint. In issuing this order, the district court reached two holdings which are relevant to this appeal. First, the district court concluded that the statute of limitations for a *qui tam* action is six years, and accordingly held that any of Relator's claims pre-dating April 30, 1997—six years prior to the filing of this claim—must be dismissed as untimely. Additionally, the district court held that Relator's original complaint did not comply with the particularity requirements of Fed. R. Civ. P. 9(b), finding that this complaint "contains no allegations as to which claims submitted by Ford would not have been paid" but for Ford's alleged fraudulent statements. (J.A. 208) Accordingly, the court ordered Relator to amend its complaint in order to bring it into compliance with Rule 9(b).

Relator filed its First Amended Complaint on October 4, 2006, and shortly thereafter, it filed copies of the annual reports Ford had submitted to the government in order to retain its eligibility as a prime contractor. In a February 1, 2007 order, the district court dismissed this amended complaint, holding that it still had not "identified any contract that Ford was allegedly wrongfully awarded as a result of being a Prime Contractor." (J.A. 356) On February 9, 2007, Relator filed a motion, which the district court construed as a motion to vacate its dismissal of this case under Rule 59(e) and to permit Relator to subsequently file a Second Amended Complaint. Accompanying this motion were additional copies of Ford's 1991–99 reports to the federal government. Although Relator argued that these reports constituted new evidence justifying the reconsideration of its case, the district court concluded that it had already considered these reports in the context of its decision dismissing the First Amended Complaint, and denied Relator's motion.

Relator now appeals to this Court, arguing that the district court erred in dismissing its complaint, in denying reconsideration of its case, and in holding that the statute of limitations in *qui tam* cases is six years.

## DISCUSSION

## I.      THE PARTICULARITY REQUIREMENT OF RULE 9(B) AND RELATOR'S FIRST AMENDED COMPLAINT

### *Standard of Review*

Relator alleges fraud in its complaint, and therefore must comply with Fed. R. Civ. P. 9(b). Dismissal of a complaint for failure to comply with Rule 9(b) is reviewed as a dismissal for failure to state a claim. *See United States ex rel Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 502 (6th Cir. 2007) ("*Bledsoe II*"). Accordingly, such a dismissal is reviewed *de novo*. *Id.* In the *qui tam* context, "the Court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1974 (2007)[6]). Under the special pleading rules contained in Rule 9(b), a complaint alleges

---

[6]At present, there is some confusion as to when a court should require particular facts to be pled, as required by *Twombly*, and when a court should apply a more liberal pleading standard. *See Iqbal v. Hasty*, 490 F.3d 143, 155–58 (2d Cir. 2007). *Twombly* held that in some cases, a plaintiff must plead particular facts in their complaint. 127 S.Ct. at 1965. In *Erickson v. Pardus*, 127 S.Ct. 2197 (2007), a case decided just two weeks after *Twombly*, the Supreme Court clarified *Twombly* by holding that a prisoner bringing a § 1983 claim against his captor is not required to state "[s]pecific facts" in their complaint; *Erickson*, 127 S.Ct. at 2200, and *Twombly* itself suggests that its holding may be limited to cases likely to produce "sprawling, costly, and hugely time-consuming" litigation. 127 S.Ct. at 1973 n. 6; *see also Iqbal*, 490 F.3d at 157–158.

Nevertheless, the instant case arises under the heightened pleading standard applicable to allegations of fraud, which itself requires the party alleging fraud to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). As Rule 9(b)'s express language requires a pleading alleging fraud to state specific facts, applying

sufficient facts to survive a motion to dismiss when the plaintiff states "with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

*Analysis*

When a *qui tam* relator pleads "a complex and far-reaching fraudulent scheme" it must "provide[] examples of specific false claims submitted to the government pursuant to that scheme" in order to comply with Rule 9(b). *Bledsoe II*, 501 F.3d at 510. For the reasons which follow, we hold that Relator has not met this standard, and therefore conclude that the decision of the district court should be affirmed with respect to the dismissal of Petitioner's complaint on Rule 9(b) grounds.

**A.    Rule 9(b) Generally**

Although Rule 9(b)'s special pleading standard is undoubtedly more demanding than the liberal notice pleading standard which governs most cases, *see Erickson*, 127 S.Ct. at 2200, Rule 9(b)'s special requirements should not be read as a mere formalism, decoupled from the general rule that a pleading must only be so detailed as is necessary to provide a defendant with sufficient notice to defend against the pleading's claims. *See Bledsoe II*, 501 F.3d at 503 ("[I]t is clear that the purpose of Rule 9 is not to reintroduce formalities to pleading, but is instead to provide defendants with a more specific form of notice as to the particulars of their alleged misconduct."); *see also Sanderson v. HCA-The Healthcare Company*, 447 F.3d 873, 877 (6th Cir. 2006) (holding that a complaint may be dismissed under Rule 9(b) if it contains "no specific information about the filing of the claims themselves—nothing, that is, to alert the defendants 'to the precise misconduct with which they are charged and to protect defendants against spurious charges of immoral and fraudulent behavior'" (quoting *United States ex. rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2002))). Instead, Rule 9(b) should be interpreted in harmony with Rule 8's statement that a complaint must only provide "a short and plain statement of the claim" made by "simple, concise, and direct allegations." *Id.* (quoting Fed. R. Civ. P. 8(a)). This Rule 8 requirement is born out of a need to ensure fundamental fairness for defendants—a complaint need not provide an exhaustive roadmap of a plaintiff's claims, but it must be sufficient to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson*, 127 S.Ct. at 2200 (quoting *Twombly*, 127 S.Ct. at 1964). So long as a complaint provides the defendant with such minimal notice, Rule 8's requirements are met.

Rule 9(b) adds additional pleading requirements for allegations of fraud or mistake, but it should not be read to defeat the general policy of "simplicity and flexibility" in pleadings contemplated by the Federal Rules. *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 678 (6th Cir. 1988) (quoting 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1298, at 407 (1969)). Rather, Rule 9(b) exists predominantly for the same purpose as Rule 8: "to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading." *Id.* Rule 9(b), however, also reflects the rulemakers' additional understanding that, in cases involving fraud and mistake, a "more specific form of notice" is necessary to permit a defendant to draft a responsive pleading. *Bledsoe II*, 501 F.3d at 503.

In our recent decision in *Bledsoe II*, we reiterated our long-standing holding that, under Rule 9(b), a plaintiff must "allege the time, place, and content of the alleged misrepresentation . . . the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud."

---

*Erickson*'s liberal pleading standard would be inappropriate in the instant case, regardless of whether this case involves the kind of "sprawling, costly and hugely time-consuming" litigation which generally triggers *Twombly*'s special pleading rule.

*Id.* at 504. As *Bledsoe II* also made clear, however, this requirement should be understood in terms of Rule 9(b)'s broad purpose of ensuring that a defendant is provided with at least the minimum degree of detail necessary to begin a competent defense. "Essentially, [a complaint] should provide fair notice to Defendants and enable them to 'prepare an informed pleading responsive to the specific allegations of fraud.'" *Id.* (quoting *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 322 (6th Cir.1999)). So long as a relator pleads sufficient detail—in terms of time, place and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met. While additional detail may be "relevant to the inquiry of whether a relator had pled the circumstances constituting fraud with particularity, it is not mandatory." *Id.* at 506.

It is worth noting, however, that although Rule 9(b)'s overarching purpose is to ensure that a defendant possesses sufficient information to respond to an allegation of fraud, two related concerns are implicit in this overarching purpose. *See Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1036, n. 25 (4th Cir. 1997) (listing three purposes behind Rule 9(b)). First, by requiring a relator to state with particularity the basis for a claim of fraud, Rule 9(b) discourages "fishing expeditions and strike suits" which appear more likely to consume a defendant's resources than to reveal evidences of wrongdoing. *Bledsoe II*, 501 F.3d at 510. Because the defendant is informed of which of its specific actions allegedly constitute fraud, it can limit discovery and subsequent litigation to matters relevant to these allegations. Additionally, Rule 9(b)'s particularity requirement protects a *qui tam* defendant from unwarranted damage to its reputation caused by "spurious charges of immoral and fraudulent behavior." *Sanderson*, 447 F.3d at 873 (quoting *Clausen*, 290 F.3d at 1310). Because the defendant is notified immediately of the focus of a relator's complaint, it can quickly resolve frivolous disputes by attacking the narrow basis of an allegation of fraud.

**B.　　Rule 9(b) and the False Claims Act**

**　　1.　　The Elements of a *Qui Tam* Claim**

Having determined the requirements of Rule 9(b) generally, we now turn to its application in the *qui tam* context. In relevant part, the False Claims Act imposes liability on a person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2). As this statutory language suggests, a claim under these portions of the False Claims Act has several elements. First, the defendant must have made a false statement or created a false record, and must have done so "with 'actual knowledge,' 'deliberate ignorance,' or 'reckless disregard of the truth or falsity of the information.'" *United States ex rel. Augustine v. Century Health Services*, 289 F.3d 409, 413 (6th Cir. 2002). Second, the defendant must have submitted a claim for payment to the federal government. *See United States ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 447 (6th Cir. 2008). Third, the defendant's false statement must have been made with the purpose of "getting a false or fraudulent claim 'paid or approved by the Government.'" *Allison Engine Co., Inc. v. United States ex rel. Sanders*, — S.Ct. —, 2008 WL 2329722 (June 9, 2008) (quoting § 3729(a)(2)). Finally, the defendant's false statement or record must have been material to the government's decision to make the payment sought in the defendant's claim. *United States ex rel. A+ Homecare, Inc. v. Medshares Management Group, Inc.*, 400 F.3d 428, 443 (6th Cir. 2005).

**　　2.　　The Particularity Requirement**

Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Accordingly, insofar as a *qui tam* action is concerned with Ford's "knowledge," this

element does not need to be pled with particularity.[7] Fed.R.Civ.P. 9(b). Similarly, it is not necessary for Relator to plead with particularity its claim that Ford made a false statement with the purpose of getting a false claim paid or approved by the government, as the question of whether Ford acted with a particular purpose inquires into the company's state of mind, and an inquiry regarding Ford's state of mind may only be pled generally. *Id.* Nevertheless, Relator must comply with Rule 9(b)'s special pleading rules in pleading the remaining elements—that is, Relator must provide sufficient details regarding the time, place and content of Ford's alleged false statements, Ford's claim for payment from the federal government, and the manner in which the false statements induced the government to make a claimed payment to Ford, to allow Ford to adequately prepare a responsive pleading. *See Bledsoe II*, 501 F.3d at 509.

Relator has identified allegedly false or fraudulent statements made by Ford with sufficient particularity. According to Relator's complaint:

> Ford fraudulently represented to the United States that payments made by Ford to Relator were payments to a small business concern owned and controlled by socially and economically disadvantaged individuals when, in fact, these payments were a sham; the Relator was being used by Ford as a conduit for the satisfaction of Ford's, not the Relator's obligations to Ford's majority suppliers of goods and services to Ford.

(J.A. 245) Moreover, Relator alleges, these fraudulent misrepresentations were made in particular reports filed annually with the federal government, and Relator has provided copies of these reports which are included in the record. In identifying these reports, Relator states with particularity "the time, place, and content of the alleged misrepresentation." *Bledsoe II*, 501 F.3d at 504. Accordingly, Relator has met its burden of identifying false or fraudulent statements made by Ford with particularity.

The same cannot be said, however, with respect to the requirement that Relator identify with particularity a claim for payment by Ford. Under the False Claims Act, a "claim" is defined as

> any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

§ 3729(c). Relator essentially argues that, during the time that it was allegedly making false reports to the government, Ford entered into a large, undetermined number of contracts with the federal government, and that the government made hundreds of millions of dollars of payments to Ford as a result of these contracts. When a relator alleges such a "complex and far-reaching fraudulent scheme" to induce the government into making payments, however, *Bledsoe II* requires the relator's complaint to include specific examples of the defendant's claims for payment from the federal government. *See id.* at 510. "In order for a relator to proceed to discovery on a fraudulent scheme, the claims that are pled with specificity must be 'characteristic example[s]' that are 'illustrative of [the] class' of all claims covered by the fraudulent scheme." *Id.* at 510–11 (alterations in original); *see also id.* at 514–15 (affirming a claim of widespread Medicare and Medicaid fraud when the Relator identified a single, representative patient who was fraudulently diagnosed to induce payment from the government).

---

[7]Relator expressly alleges in its complaint that Ford has been "knowingly or recklessly submitting to the United States claims that Ford knew were false and/or otherwise ineligible for payment," (J.A. 244), and Ford does not contest that Relator has sufficiently pled the scienter element of its *qui tam* claim.

Despite the requirement that Relator must provide specific examples of claims submitted to the government as part of Ford's alleged fraudulent scheme, Relator does not provide a single example of a specific claim made by Ford. Instead, Relator merely alleges that "[f]rom 1991 through at least 2001, Ford was awarded contracts on an annual basis by the General Services Administration." (J.A. 240) Although Relator also provides an estimate of the approximate value of these contracts during the years 1991–2000, Realtor does not identify any individual representative claim for payment made by Ford to the federal government during this time period. Accordingly, we hold that Relator has not complied with *Bledsoe II*'s mandate that "'[i]n order for a relator to proceed to discovery on a fraudulent scheme,' it must pled with specificity 'characteristic example[s]' that are 'illustrative of [the] class' of all claims covered by the fraudulent scheme." 501 F.3d at 510–11; *see also Sanderson*, 447 F.3d at 877 ("Rule 9(b) 'does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply . . . that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government.'" (quoting *Clausen*, 290 F.3d at 1310)). We therefore affirm the decision of the district court dismissing Relator's complaint.

## II.     RELATOR'S MOTION TO FILE AN AMENDED COMPLAINT

### *Standard of Review*

Subsequent to the district court's decision dismissing Relator's complaint, Relator filed a motion seeking leave to file a Second Amended Complaint, which the district court properly construed as a motion to vacate the dismissal of Relator's complaint under Rule 59(e). The district court has discretion to grant or deny such a motion, so its decision to deny the motion is reviewed for abuse of discretion. *Intera Corp. v. Henderson*, 428 F.3d 605, 619 (6th Cir. 2005).

### *Analysis*

Subsequent to the district court's decision dismissing its complaint, Relator sought leave to file a Second Amended Complaint, which included "a listing of the contracts, the contracts value, and the number of vehicles awarded to Ford Motor Company for the period from 1991 to 1999." (J.A. 21) In a March 16, 2007 order, the district court denied Relator's motion to file a Second Amended Complaint, holding that the amendment would be futile because Relator "has simply been unable to frame its allegations within the confines of the FCA." (*Id*.) On September 6, 2007, this Court handed down a new rule of law in *Bledsoe II*, holding that a *qui tam* case may proceed to discovery if the relator's complaint "pleads a complex and far-reaching fraudulent scheme with particularity, and provides examples of specific false claims submitted to the government pursuant to that scheme." 501 F.3d at 510. Because the district court did not have an opportunity to consider our holding in *Bledsoe II* before denying the motion to file an amended complaint, we remand Relator's appeal of this denial for further consideration in light of *Bledsoe II*.

Although Relator filed his motion to file a Second Amended Complaint subsequent to the district court's final order dismissing Relator's First Amended Complaint, we allow a district court discretion to set aside a prior judgment under Rule 59(e) and permit an amended complaint to be filed under such circumstances. *See Oleson v. United States*, 27 F. App'x 566, 570 n.1 (6th Cir. 2001); *see also* 6 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1489 (2d ed. 1990) ("Most courts faced with the problem have held that once a judgment is entered the filing of an amendment cannot be allowed until the judgment is set aside or vacated under Rule 59 or Rule 60.") Setting aside judgment in this manner is appropriate in four circumstances: if there is: "(1) a clear error of law; (2) newly discovered evidence; (3) *an intervening change in controlling law*; or (4) a need to prevent manifest injustice." *Henderson v. Walled Lake Consolidated Schools*, 469 F.3d 479, 496 (6th Cir. 2006) (emphasis added).

Relator's proposed Second Amended Complaint provides far greater detail than its First Amended Complaint, stating that "[f]rom 1991 through 1999, Ford was awarded 65 contracts by the GSA," and even identifying many of those contracts by their "Ford Contract Nos.," thus providing Ford with the specific filing numbers it uses to identify individual contacts within its own internal accounting system.[8] (J.A. 381–82) Nevertheless, the question of whether, in light of our intervening decision in *Bledsoe II*, the district court should grant the motion to file an amended complaint rests within the district court's discretion. Insofar as *Bledsoe II* may now justify granting the motion to file an amended complaint, the district court should be permitted to exercise its discretion regarding that motion in the first instance—an appellate court generally should not substitute its own judgment for a district court's unexercised discretion. *See Bledsoe II*, 501 F.3d at 521 n.22; *Nash v. Eberlin*, 437 F.3d 519, 526 n.10 (6th Cir. 2006). Accordingly, we vacate the district court's denial of Relator's motion to file a Second Amended Complaint, and remand the matter to allow the district court to decide whether to exercise its discretion in light of *Bledsoe II*.

On remand, the district court should consider whether the following rule, which we articulated in *Bledsoe II*, justifies setting aside its prior judgment and allowing Relator to amend its complaint:

> We conclude that the concept of a false or fraudulent scheme should be construed as narrowly as is necessary to protect the policies promoted by Rule 9(b). Specifically, we hold that the examples that a relator provides will support more generalized allegations of fraud only to the extent that the relator's examples are representative samples of the broader class of claims. In order for a relator to proceed to discovery on a fraudulent scheme, the claims that are pled with specificity must be "characteristic example[s]" that are "illustrative of [the] class" of all claims covered by the fraudulent scheme. The examples of false claims pled with specificity should, in all material respects, including general time frame, substantive content, and relation to the allegedly fraudulent scheme, be such that a materially similar set of claims could have been produced with a reasonable probability by a random draw from the total pool of all claims. With this condition satisfied, the defendant will, in all likelihood, be able to infer with reasonable accuracy the precise claims at issue by examining the relator's representative samples, thereby striking an appropriate balance between affording the defendant the protections that Rule 9(b) was intended to provide and allowing relators to pursue complex and far-reaching fraudulent schemes without being subjected to onerous pleading requirements.

501 F.3d at 510–11 (internal citations omitted). In reconsidering Relator's motion in light of *Bledsoe II*, the "governing principle" guiding the district court's consideration should be whether

---

[8]Indeed, in contrast to the dissent's contention, the new details included in the Second Amended Complaint include several examples of false claims. Similar to Relator's First Amended Complaint, the Second Amended Complaint identifies specific false statements made by Ford, thereby fulfilling one of the elements of a false claim. *See Augustine*, 289 F.3d at 413. Unlike the First Amended Complaint, however, the Second Amended Complaint also identifies numerous claims for payment Ford submitted to the federal government—another necessary element of a false claim. *Marlar*, 525 F.3d at 447. For example, in ¶45 of the Second Amendment Complaint, Relator alleges that the federal government paid Ford's claims for payment pursuant to "Ford Contract Nos. 10048, 10099, 10147, 10152, 10162, 10165, 95021, and 95042," and these payments were in the "respective amounts of $28,778,143.00, $12,181,678.00, $3,132,114.00, $31,556.00, $8,960,822.00, $32,409,513.52, $11,116,100.00, $16,319,424.00 and $168,397,635.00." (J.A. 382) Moreover, the Second Amended Complaint also alleges "[i]n response to Ford's claims for payment, the GSA paid Ford money under each contract that it would not have paid Ford had it been aware that the Subcontract Plans and SF-295 Forms submitted by Ford were false." (J.A. 384) This allegation complies with Rule 9(b)'s requirement that Relator plead with particularity that Ford's alleged false statement or record was material to the government's decision to make the payment requested by Ford. *A+ Homecare, Inc.*, 400 F.3d at 443. As we have already explained in Part I of this opinion, Rule 9(b) does not require a relator to plead any additional elements of a false claim with particularity.

vacating its order dismissing Relator's complaint, and allowing the amended complaint, "is required in order to prevent an injustice; and where an injustice will otherwise result, the trial judge has the duty as well as the power to order a new trial." *Davis by Davis v. Jellico Community Hospital, Inc.*, 912 F.2d 129, 133 (1990).

Finally, we acknowledge that, in light of the Supreme Court's recent decision in *Allison Engine Co. v. United States ex rel. Sanders*, the law in this Circuit is now less friendly to *qui tam* plaintiffs than it was prior to that decision. In *Sanders*, the Supreme Court held that a *qui tam* plaintiff may only prevail upon a showing that the defendant made a false statement with the purpose of "getting a false or fraudulent claim 'paid or approved by the Government.'" 2008 WL 2329722, at *5 (quoting § 3729(a)(2)). Because Rule 9(b) exempts allegations of "malice, intent, knowledge, and other conditions of a person's mind" from its heightened pleading requirement, it is not necessary, at least at this early stage of the litigation, for Relator to allege with particularity facts showing that Ford acted with a particular purpose. Fed. R. Civ. P. 9(b). Nevertheless, because the district court has not had the opportunity to consider Relator's proposed Second Amended Complaint in light of *Sanders*, it would also be inappropriate for us to impose our view of whether *Sanders* prevents Relator from filing his Second Amended Complaint when the district court has not had the opportunity to consider this question in the first instance. *See Bledsoe II*, 501 F.3d at 521 n.22; *Nash*, 437 F.3d at 526 n.10. Accordingly, we will allow the district court to consider this issue on remand.

## III.    STATUTE OF LIMITATIONS

Finally, Relator challenges the district court's determination that the statute of limitations in a *qui tam* case brought by a private party relator is always six years. The False Claims Act permits a suit alleging fraud against the government to proceed in multiple ways. First, the Attorney General, upon discovering a potential violation of the Act, may initiate a civil action against the person committing fraud. 31 U.S.C. § 3730(a). Additionally, any person who is the "original source" of information implicating a potential defendant in an act of fraud against the government may bring a suit as a relator in the name of the United States. § 3730(b)(1) & (e)(4)(A). Before filing such a suit, the relator must first serve the complaint upon the government, and the complaint must remain under seal for at least sixty days. § 3730(b)(2). During this time period, the government may "take over" the action, in which case all future litigation is conducted by the government. § 3730(b)(4)(B). If the government declines to do so, however, the relator may proceed with the litigation at its own direction, with the caveat that the government may later intervene upon a showing of good cause. § 3730(c)(3). Should a suit initiated by a relator prove meritorious, the relator is entitled to a share of the proceeds, although the lion's share of these proceeds will be awarded to the government. § 3730(d).

Under 31 U.S.C. § 3731, the statute of limitations for a claim brought under the False Claims Act is as follows:

(b) A civil action under section 3730 may not be brought--

> (1) more than 6 years after the date on which the violation of section 3729 is committed, or

> (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,

whichever occurs last.

§ 3731(b).  The applicability of the § 3731(b)(2) tolling provision to suits litigated entirely by private party relators appears to be an issue of first impression before this Circuit.[9]  Relying on the Ninth Circuit's decision in *United States ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211 (9th Cir. 1996), Relator argues that, notwithstanding § 3731(b)(2)'s reference to an "official of the United States charged with responsibility to act in the circumstances," the extended statute of limitations period contained in that subsection should nonetheless be applied to suits litigated by a private-party relator.  Under the Ninth Circuit's view, "the statute of limitations begins to run once [the] *qui tam* plaintiff knows or reasonably should have known the facts material to this right of action." *Id.* at 1217.

United States courts of appeal are not united around the Ninth Circuit's view.  Ford argues that we should apply the Tenth Circuit's decision in *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702 (10th Cir. 2006), which held that "the tolling provision of § 3731(b) was not intended to apply to private *qui tam* suits." *Id.* at 725.  Additionally, a handful of federal judges confronted with the question of § 3731(b)(2)'s applicability to private party relators have adopted a third view.  Under this third way of resolving the statute of limitations question, "[t]he appropriate standard for determining when the three year limitation period in § 3731(b)(2) began to run is when the Department of Justice received information as to the violation." *United States ex rel. Colunga v. Hercules, Inc.*, No. 89-CV-954B, 1998 WL 310481, at *5 (D.Utah Mar.6, 1998); *see Sikkenga*, 472 F.3d at 735 (Hartz, J., dissenting).

Because we affirm the district court's dismissal of Relator's complaint on Rule 9(b) grounds, however, it is not necessary for us to resolve whether the § 3731(b)(2) tolling provision applies to private party relators.  Moreover, inasmuch as this statute of limitations question could be raised again should the district court grant Relator's motion for leave to file an amended complaint, the district court has not yet granted that motion, and thus the issues raised by Relator's proposed Second Amended Complaint do not currently raise a live controversy before this Court.  Accordingly, the statute of limitations question is not presently ripe for review by this Court. *See United States v. Lee*, 502 F.3d 447, 450 (6th Cir. 2007).

## CONCLUSION

The district court correctly determined that Relator's First Amended Complaint does not comply with the particularity requirement of Rule 9(b).  However, because our recent decision in *Bledsoe II* alters the law governing Relator's motion to file a Second Amended Complaint, the district court should be permitted to decide whether to exercise its discretion in light of the currently

---

[9]*Bledsoe II* stated that six years is "the statute of limitations under the [False Claims Act]," 501 F.3d at 515, but it contains no discussion of § 3731(b)(2)'s tolling provision, and the applicability of that provision to private-party relators does not appear to have been raised in *Bledsoe II*.

applicable rule of law. Accordingly, we **AFFIRM** the dismissal of Relator's First Amended Complaint, **VACATE** the order denying the motion to amend that complaint, and **REMAND** for further consideration of that motion in light of *Bledsoe II*.

---

**CONCURRENCE**

---

SUHRHEINRICH , Circuit Judge, concurring.  I concur in Judge Clay's opinion, except to the extent footnote 8 suggests that the Second Amended Complaint, as drafted, complies with Fed. R. Civ. Proc. 9(b).  Our instruction for the district court to consider *Bledsoe II* should not be taken to imply that the district court must grant Relator leave to file an amended complaint, or that the Second Amended Complaint, as drafted, is sufficient.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

COOK, Circuit Judge, concurring in part and dissenting in part. The majority reaches the right conclusion with regard to the district court's dismissal of Relator's First Amended Complaint. Relator's failure to "provide a single example of a specific [false] claim" doomed that complaint because Fed. R. Civ. P. 9(b) "'does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply . . . that claims requesting illegal payment must have been submitted, were likely submitted or should have been submitted to the Government.'" Maj. Op. at 13, 14 (quoting *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006)).

But having correctly concluded that Relator's First Amended Complaint deserves dismissal, the majority nevertheless keeps alive the Second Amended Complaint, despite the district court's finding that it too failed to identify a false claim. JA 21. Although the majority cannot point to a false claim identified by the Second Amended Complaint,[1] it vacates and remands after concluding that *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.* ("*Bledsoe II*"), 501 F.3d 493 (6th Cir. 2007), announced an intervening change in controlling law which the district court ought to apply in the first instance. *Bledsoe II*, however, broke new ground on an impertinent issue—whether *every* false claim must be identified by a False Claims Act plaintiff alleging a complex, fraudulent scheme. *Id*. at 509–10. It did not disturb, alter, or modify the requirement to specifically identify *at least one* false claim—"the *sine qua non* of a False Claims Act violation." *Sanderson*, 447 F.3d at 878 (internal quotation marks omitted); *see also* Maj. Op. at 5–8 (affirming dismissal of Relator's First Amended Complaint for failing to identify "a specific [false] claim"). Because the Second Amended Complaint also identifies no false claim, I see no reason to remand to the district court so that it may reissue the same decision. Nor do I see a reason to require another panel of this court to re-confront this case—it should be resolved today.

Accordingly, I respectfully dissent from part II of the majority's opinion.

---

[1] In his footnote 8, Judge Clay highlights specific contracts that the plaintiffs allege the government awarded to Ford as a result of Ford's fraud and the dollar value attached to those contracts. But a contract is not a claim.