*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0282p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA *ex rel.* SNAPP,
INC.,

                     *Plaintiff-Appellant,*

       *v.*

FORD MOTOR COMPANY,

                     *Defendant-Appellee.*

No. 09-1654

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 06-11848—Avern Cohn, District Judge.

Argued: August 4, 2010

Decided and Filed: September 1, 2010

Before: BOGGS and CLAY, Circuit Judges; and WISEMAN, District Judge.[*]

_____

## COUNSEL

**ARGUED:** David H. Fink, THE MILLER LAW FIRM, P.C., Rochester, Michigan, for
Appellant. Francis R. Ortiz, DICKINSON WRIGHT PLLC, Detroit, Michigan, for
Appellee. **ON BRIEF:** David H. Fink, E. Powell Miller, THE MILLER LAW FIRM,
P.C., Rochester, Michigan, for Appellant. Francis R. Ortiz, Kenneth J. McIntyre, Jodi
Munn Schebel, DICKINSON WRIGHT PLLC, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

      BOGGS, Circuit Judge. SNAPP, Inc. ("SNAPP" or "Relator") appeals from an
order of the district court denying its motion to alter or amend a final judgment so as to
permit it to file an amended complaint in litigation brought pursuant to the False Claims

_____

[*] The Honorable Thomas A. Wiseman Jr., United States District Judge for the Middle District of
Tennessee, sitting by designation.

Act ("FCA"), 31 U.S.C. § 3729 *et seq.*  SNAPP argues that the district court erred in concluding that the proposed amended complaint, which included a list of contracts that the Government allegedly entered into as a result of fraudulent representations on the part of Ford, did not allege with sufficient particularity the existence of a "claim" as defined by the FCA.

# I

This case is before us for the second time.  *See United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496 (6th Cir. 2008) ("*SNAPP I*").  In *SNAPP I*, we set forth the relevant factual and procedural history, as it existed to that point, as follows:

> According to Relator, Ford is a "prime contractor" to the United States, and is accordingly required to comply with certain federal laws governing the use of small and minority-owned businesses as subcontractors.  Among these requirements, a prime contractor may not contract with the federal government unless they establish a plan to "provide[] the maximum practicable opportunity" for small businesses and minority-owned businesses to subcontract with the prime contractor.  Failure to develop such a plan can render a prime contractor ineligible to receive federal contracts.

> Relator alleges that, from 1991 until 1999, Ford fraudulently exaggerated the extent of its dealings with small and minority-owned businesses, and that these exaggerations induced the federal government to contract with Ford, even though Ford never implemented a plan to "provide[] the maximum practicable opportunity" to such businesses.  According to Relator, during this eight-year period Relator was controlled entirely by Ford.  Ford nominated the majority of Relator's board members, its organization charts included Relator and its employees, and Ford had full control over its dealings with Relator.  Though Relator was nominally owned and managed by a person of color, Relator maintains that this nominal control was a sham, and that Relator actually operated as a subdivision of the Ford Motor Company.  Moreover, Relator claims, even if it did qualify as a minority-owned business during its dealings with Ford, from 1995 until 1999, Relator had too many employees to qualify as a small business.

> Despite Relator's claims that it functioned entirely as a subdivision of Ford, Ford filed official reports with the government stating that, between 1991 and 1998, Ford made significant improvements in the amount of business it subcontracted to small and

minority-owned businesses.  As a prime government contractor, Ford was required to file yearly reports documenting what percentage of the subcontracts related to its government contracts were made with small or minority-owned businesses. . . .

The crux of Relator's complaint is that, despite Ford's reports claiming that it had enacted and was successfully implementing a plan to "provide[] the maximum practicable opportunity" to small and minority-owned businesses, Ford had inflated the extent of its dealings with such businesses by fraudulently declaring money paid to Relator as a subcontract with a small and minority-owned business. . . . Ford, Relator claims, would subcontract with a large, majority-owned business; Ford would then launder its payments to that large, majority-owned business through Relator.  Under this scheme, Relator would receive those payments only for the purpose of passing them through to the large, majority-owned subcontractor, but Ford would still report these transactions to the government as a subcontract with a small, minority-owned business.

. . . .

In light of these alleged sham payments, Relator claims that had the federal government been aware that Ford was exaggerating its dealings with small and minority-owned businesses, it would not have permitted Ford to act as a prime contractor.  Accordingly, Relator argues, none of the federal government contracts Ford received during the period that it was allegedly inflating its dealings with small and minority-owned businesses would have been awarded to Ford.  Because these contracts were allegedly awarded to Ford as a direct result of Ford's fraudulent statements, Relator further claims that none of the payments made to Ford under these contracts would have been made had Ford not deceived the government.

. . . .

On April 30, 2003, Relator filed its original complaint, under seal, in the Southern District of Ohio.  That complaint was unsealed on July 19, 2004, when the United States declined to intervene. . . .  On April 14, 2006, the parties . . . stipulated to a transfer of this case to the Eastern District of Michigan.

On September 7, 2006, the district court issued an order dismissing a portion of Relator's claim and ordering Relator to file an amended complaint. . . .  Additionally, the district court held that Relator's original complaint did not comply with the particularity requirements of Fed. R. Civ. P. 9(b), finding that this complaint "contains no allegations as to which claims submitted by Ford would not have been

paid" but for Ford's alleged fraudulent statements. Accordingly, the court ordered Relator to amend its complaint in order to bring it into compliance with Rule 9(b).

Relator filed its First Amended Complaint on October 4, 2006, and shortly thereafter, it filed copies of the annual reports Ford had submitted to the government in order to retain its eligibility as a prime contractor. In a February 1, 2007 order, the district court dismissed this amended complaint, holding that it still had not "identified any contract that Ford was allegedly wrongfully awarded as a result of being a Prime Contractor." On February 9, 2007, Relator filed a motion, which the district court construed as a motion to vacate its dismissal of this case under Rule 59(e) and to permit Relator to subsequently file a Second Amended Complaint. Accompanying this motion were additional copies of Ford's 1991–99 reports to the federal government. Although Relator argued that these reports constituted new evidence justifying the reconsideration of its case, the district court concluded that it had already considered these reports in the context of its decision dismissing the First Amended Complaint, and denied Relator's motion.

*Id.* at 499–502 (citations and footnotes omitted). Following the district court's dismissal of SNAPP's First Amended Complaint and its denial of SNAPP's motion to file a Second Amended Complaint, SNAPP filed its appeal in *SNAPP I*.

On appeal, we affirmed the dismissal of SNAPP's First Amended Complaint on Rule 9(b) grounds, finding that the complaint's allegation that "[f]rom 1991 through at least 2001, Ford was awarded contracts on an annual basis by the General Services Administration," coupled with an estimate of the approximate value of those contracts, failed to comply with the Rule 9(b) requirement that a relator "state with particularity the circumstances constituting fraud or mistake." *SNAPP I*, 532 F.3d at 504–06.

Specifically, we observed that the portion of the FCA under which SNAPP now alleges a cause of action[1] "imposes liability on a person who 'knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent

---

[1]Originally, SNAPP's Second Amended Complaint also claimed that Ford violated 31 U.S.C. § 3729(a)(1), which imposes liability on any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval." That claim was withdrawn by SNAPP before the district court and is not before us.

claim paid or approved by the Government.'"[2]  *SNAPP I*, 532 F.3d at 504 (quoting 31 U.S.C. § 3729(a)(2)).  We then noted that a cause of action under that portion of the FCA contained several elements, including: (1) that the defendant make a false statement or create a false record with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information; (2) that the defendant have submitted a claim for payment to the federal government; (3) that the defendant's false statement have been made with the purpose of getting a false or fraudulent claim paid or approved by the Government; and (4) that the false statement or record have been material to the Government's decision to make the payment sought in the defendant's claim.  *Id.* at 504–05.  We found that SNAPP had adequately pleaded the existence of a false statement or record, and that Rule 9(b) did not require SNAPP to plead the elements dealing with Ford's state of mind with particularity.

However, we further observed that, given that SNAPP had alleged a "complex and far-reaching fraudulent scheme," it was subject to a rule of law recently established in *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 501 F.3d 493 (6th Cir. 2007) ("*Bledsoe II*").  Under the rule of *Bledsoe II*, a relator who alleges such a complex and far-reaching fraudulent scheme need not state with particularity *all* of the false claims made over the course of the scheme, but must nevertheless "include specific examples of the defendant's claims for payment" that are "characteristic example[s] . . . illustrative of [the] class of all claims covered by the fraudulent scheme."  *SNAPP I*, 532 F.3d at 506 (quoting *Bledsoe II*, 501 F.3d at 510–11) (internal quotation marks omitted).  With that in mind, we held in *SNAPP I* that:

---

[2]We note that, since the filing of this case, Congress has changed the language of this portion of the FCA.  The Fraud Enforcement Recovery Act of 2009, Pub. L. No. 111-21, § 4, 123 Stat. 1617 ("FERA"), renumbered it as § 3729(a)(1)(B) and altered it so as to impose liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  123 Stat. at 1621.  FERA also provided that this new language "shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. § 3729 et seq.) that are pending on or after that date."  123 Stat. at 1625.  It is unsettled, however, whether the retroactive effect mandated by Congress applies to "claims" in the sense of demands made via litigation or "claims" as defined by the FCA.  *See  Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1327 n.3 (11th Cir. 2009) (concluding the latter).  We find that our reasoning in this case is unaffected by the difference, and presume that the language that existed in 2003, when SNAPP filed its original complaint, governs.

> Despite the requirement that Relator must provide specific examples of claims submitted to the government as part of Ford's alleged fraudulent scheme, Relator does not provide a single example of a specific claim made by Ford. Instead, Relator merely alleges that "[f]rom 1991 through at least 2001, Ford was awarded contracts on an annual basis by the General Services Administration." Although Relator also provides an estimate of the approximate value of these contracts during the years 1991–2000, Relator does not identify any individual representative claim for payment made by Ford to the federal government during this time period. Accordingly, we hold that Relator has not complied with *Bledsoe II*'s mandate that "'[i]n order for a relator to proceed to discovery on a fraudulent scheme,' it must ple[a]d with specificity 'characteristic example[s]' that are 'illustrative of [the] class' of all claims covered by the fraudulent scheme."

*SNAPP I*, 532 F.3d at 506 (citations omitted). Thus the dismissal of the First Amended Complaint was affirmed in the first instance because SNAPP failed to identify with particularity *any* claim for payment by Ford (as required by the second element discussed above), and in the second instance because it failed to demonstrate that any such claims they might be able to identify were illustrative of the class of claims alleged to exist between 1991 and 2000.

Despite affirming the dismissal of SNAPP's First Amended Complaint, however, we vacated the district court's decision denying SNAPP's motion to file a Second Amended Complaint "[b]ecause the district court did not have an opportunity to consider our holding in *Bledsoe II* before denying the motion." *SNAPP I*, 532 F.3d at 507. We also observed that the proposed Second Amended Complaint "provide[d] far greater detail" in that it identified many of the specific contracts allegedly entered into because of fraud by their "Ford Contract Nos.," but we nevertheless indicated that the question of whether to grant the motion to file a Second Amended Complaint in light of *Bledsoe II* was within the district court's discretion. *Id.* at 507–08. Accordingly, we remanded to the district court so that it might reconsider the motion to file SNAPP's Second Amended Complaint in light of *Bledsoe II*, specifying that the "governing principle" guiding that consideration "should be whether vacating its order dismissing Relator's complaint, and allowing the amended complaint, 'is required in order to prevent an

injustice.'" *SNAPP I*, 532 F.3d at 508 (quoting *Davis by Davis v. Jellico Cmty. Hosp., Inc.*, 912 F.2d 129, 133 (1990)).

Significantly, we did *not* decide the question of whether the list of contracts provided by SNAPP, together with the amounts of payments alleged to have been made by the Government pursuant to those contracts, qualified as "claims" within the meaning of the FCA or sufficed to meet the Rule 9(b) requirement that allegations of fraud be pleaded with particularity. *See SNAPP I*, 532 F.3d at 507 n.8 (arguing that "the new details included in the Second Amended Complaint include several examples of false claims"); *id.* at 510–11 (Suhrheinrich, J., concurring) (joining the lead opinion "except to the extent footnote 8 suggests that the Second Amended Complaint, as drafted, complies with" Rule 9(b), and stressing that remand "should not be taken to imply . . . that the Second Amended Complaint, as drafted, is sufficient"); *id.* at 511 (Cook, J., concurring in part and dissenting in part) ("Because the Second Amended Complaint also identifies no false claim, I see no reason to remand to the district court so that it may reissue the same decision.").

On remand, the district court directed the parties to file briefs on whether, in light of *Bledsoe II*, dismissal pursuant to Rule 9(b) was appropriate; it also heard oral arguments on the issue. On April 7, 2009, the district court issued its Memorandum and Order on Remand. In so doing, the district court observed that "[t]he rub of this case has been, and remains, whether SNAPP has identified an actual 'claim' under the FCA." *United States ex rel. SNAPP, Inc.*, No. 06-11848, 2009 WL 960482, at *6 (E.D. Mich. April 7, 2009). In concluding that no such claim had been identified, the district court held that *Bledsoe II* did not alter the requirement that the relator "plead at least one claim which is characteristic of the type of claims" being asserted, and that nothing in that case "makes a 'listing' of contracts awarded to Ford, the value of the contracts, and the number of vehicles awarded to Ford the same as a 'request or demand, whether under a contract or otherwise, *for payment*.'" *Id.* at *8 (quoting 31 U.S.C. § 3729) (emphasis supplied by district court). Accordingly, the district court held that SNAPP's proposed Second Amended Complaint, like its First Amended Complaint, failed to meet the

requirements of Rule 9(b) because it failed to identify with specificity a claim for payment.[3]

This timely appeal followed.

## II

The parties to this appeal differ as to the appropriate standard of review to be applied in this case. SNAPP would have us review the district court's judgment de novo, as we generally do for orders dismissing a case for failure to state a claim. *See, e.g.*, *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010). Ford, however, asserts that the matter before the district court was a motion to alter or amend the district court's judgment pursuant to Federal Rule of Civil Procedure 59(e), and thus should be subject to the more deferential abuse-of-discretion standard. *See, e.g.*, *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1047 (6th Cir. 2001).

We agree with Ford. "The basic tenet of the mandate rule is that the district court is bound to the scope of the remand issued by the court of appeals." *United States v. Campbell*, 168 F.3d 263, 265 (6th Cir. 1999). In *SNAPP I*, we did not remand to the district court for a de novo look at whether SNAPP's proposed second amended complaint was sufficiently particularized to pass muster under the Federal Rules. Rather, we "remand[ed] the matter to allow the district court to decide whether to *exercise its discretion* in light of *Bledsoe II*." *SNAPP I*, 532 F.3d at 508 (emphasis added). Moreover, SNAPP's attempt to file its Second Amended Complaint occurred *after* the district court's final order dismissing the First Amended Complaint, a judgment

---

[3]In addition to remanding in light of *Bledsoe II*, we also remanded to the district court for consideration of an intervening Supreme Court decision, *Allison Engine Co. v. United States ex rel. Sanders*, 128 S.Ct. 2123 (2008). In so doing, we observed that the *Sanders* case made "the law in this Circuit . . . less friendly to *qui tam* plaintiffs than it was prior to that decision" by holding "that a *qui tam* plaintiff may only prevail upon a showing that the defendant made a false statement with the purpose of getting a false or fraudulent claim paid or approved by the Government." *SNAPP I*, 532 F.3d at 509 (internal citation and quotation marks omitted). We further indicated that it would be "inappropriate for us to impose our view of whether *Sanders* prevent[ed] Relator from filing his Second Amended Complaint" before permitting the district court to address the question. *Ibid.* The district court did not substantively address the effect of the Supreme Court's decision in *Sanders* on remand, however, presumably because it felt no need to determine whether that case made the law "less friendly" to SNAPP given that the district court found that SNAPP's complaint was insufficient under the already-existing law of the circuit. On appeal, both parties agree that *Sanders* does not materially affect the outcome of this case, and we therefore likewise do not consider the question.

we did not vacate and thus one that remains in effect.  As we observed in *SNAPP I*, when a party moves to file an amended complaint after final judgment, "we allow a district court discretion to set aside a prior judgment under Rule 59(e)," which permits setting aside judgment, among other times, when there has been "'*an intervening change in controlling law*.'"  *Id.* at 507 (quoting *Henderson v. Walled Lake Consolidated Schs.*, 469 F.3d 479, 496 (6th Cir. 2006)) (emphasis added by *SNAPP I*).  Such setting aside is a necessary precondition before a district court can grant leave to amend a complaint following a judgment dismissing the case. *See Oleson v. United States*, 27 F. App'x 566, 570 n.1 (6th Cir. 2001).

Thus, consistent with the terms of the remand and our previous case law, we construe the district court's denial of SNAPP's motion to file its Second Amended Complaint as a denial of a motion to alter or amend its earlier judgment pursuant to the specific portion of Rule 59(e) that permits setting aside of judgment in the event of an intervening change of controlling law.  Accordingly, we review the district court's decision for abuse of discretion.

**III**

In order to decide the question before us, we necessarily compare the basis for the district court's initial decision to deny SNAPP's motion to file its Second Amended Complaint with the holdings of *Bledsoe II*.

In *Bledsoe II*, a *qui tam* relator alleged that a hospital in which she worked as a respiratory therapist had engaged in "upcoding" and other serious billing irregularities, the result of which were to increase the amount billed to the Government under Medicare and Medicaid.  *Bledsoe II*, 501 F.3d at 497–98.  Though the relator in that case claimed to have knowledge of multiple practices designed to increase billing amounts, we affirmed almost all parts of the district court's dismissal of her allegations because she "d[id] not identify any specific instance where Medicare or Medicaid was wrongfully billed." *Id.* at 514.

In constructing our analytical framework in *Bledsoe II*, we made several holdings of general relevance to relators who are attempting to prove complex and far-reaching schemes under which multiple instances of false claims are alleged to have been made. Given the parties' arguments, three of those holdings are of particular importance here.

First, we held that, even in situations in which the relator pleads such a false scheme, "pleading an actual false claim with particularity is an indispensible element of a complaint that alleges a FCA violation in compliance with Rule 9(b)." *Bledsoe II*, 501 F.3d at 504. Such a requirement "emerges from the conjunction of Rule 9(b) and the statutory text of the FCA." *Ibid.* Therefore, we concluded, a 9(b)-compliant complaint "must include an averment that a false or fraudulent claim for payment or approval has been submitted to the government." *Ibid.* Although we "[did] not intend to foreclose the possibility of a court relaxing this rule in circumstances where a relator demonstrates that he cannot allege the specifics of actual false claims that in all likelihood exist, and the reason that the relator cannot produce such allegations is not attributable to the conduct of the relator," *id.* at 504 n.12, neither did we express any opinion "as to the contours or existence of any such exception." *Ibid.*

Second, mindful of the fact that "[w]here the allegations in a relator's complaint are 'complex and far-reaching, pleading every instance of fraud would be extremely ungainly, if not impossible," we held in *Bledsoe II* that "where a relator pleads a complex and far-reaching fraudulent scheme with particularity, and *provides examples of specific false claims* submitted to the government pursuant to that scheme, a relator may proceed to discovery on the entire fraudulent scheme." *Bledsoe II*, 501 F.3d at 509, 510 (internal quotation marks and citation omitted) (emphasis added).

Finally, in addressing the question of when such examples would suffice to meet Rule 9(b), we held

> that the examples that a relator provides will support more generalized allegations of fraud only to the extent that the relator's examples are *representative samples* of the broader class of claims . . . . In order for a relator to proceed to discovery on a fraudulent scheme, the claims that are pled with specificity must be characteristic examples that are

illustrative of the class of all claims covered by the fraudulent scheme. The examples of false claims pled with specificity should, in all material respects, including general time frame, substantive content, and relation to the allegedly fraudulent scheme, be such that a materially similar set of claims could have been produced with a reasonable probability by a random draw from the total pool of all claims.

*Bledsoe II*, 501 F.3d at 510–11.

None of these holdings altered the basis on which the district court denied SNAPP's motion to file its Second Amended Complaint. The first *Bledsoe II* holding reaffirmed a preexisting general requirement for FCA claims. *See Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 878 (6th Cir. 2006) ("the fraudulent claim is the *sine qua non* of a False Claims Act violation") (internal quotation marks and citation omitted). Far from being an intervening change in the law, this requirement formed part of the basis for the district court's decision denying SNAPP's motion to file its Second Amended Complaint. *See United States ex rel. SNAPP v. Ford Motor Co.*, No. 2:06-cv-11848 (E.D. Mich. Mar. 16, 2007) (denying leave to file the Second Amended Complaint because "[t]he Court already found that these contracts do not constitute a 'claim' under the FCA"). Nor does our first holding in *Bledsoe II* abrogate in any way our circuit's established holding that "Rule 9(b) 'does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply . . . that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government.'" *Sanderson*, 447 F.3d at 877 (quoting *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2002)). The second and third of the relevant *Bledsoe II* holdings, meanwhile, *presume* the existence of at least one valid claim and discuss only the circumstances under which a relator may plead the existence of a broader class of such claims through the use of representative examples. Thus none of the holdings of *Bledsoe II* alter the requirement that at least one claim be pleaded with specificity, or provide support for the argument that a contract—even an especially well-identified one—is a "claim" within the meaning of the FCA.

Because no holding of *Bledsoe II* affected the circuit's law on the questions at issue before the district court, the district court did not abuse its discretion in holding that its original rationale for not permitting SNAPP to file its Second Amended Complaint pursuant to Rule 59(e) still obtained and that permitting such a filing was not otherwise "required in order to prevent an injustice." Although we note that the parties vigorously contest the question of whether a listing of contracts might, under some circumstances, suffice to meet the requirement that an FCA complaint plead a false claim with particularity, we are simply not called upon in this appeal to decide that issue. Rather, we hold only that the district court did not abuse its discretion in determining that nothing in *Bledsoe II* changed the controlling law in this case.

## IV

For the foregoing reasons, the decision of the district court denying SNAPP's motion to file a Second Amended Complaint is **AFFIRMED**. We note that SNAPP has also moved this court for reassignment of this case to a different district judge on remand; that motion is **DENIED AS MOOT**.